**IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF FLORIDA PENSACOLA DIVISION**

**CHANTAL DEEL,**

**Plaintiff,**

**v.** **Case No.: 3:05cv120/MCR**

**METROMEDIA RESTAURANT SERVICES MANAGEMENT CO., L.P.,**

**Defendant.**
**_____________________________/**

**O R D E R**

Plaintiff Chantal Deel ("Deel") sues defendant Metromedia Restaurant Services Management Co., L. P., ("MRSMC" or "Steak and Ale") alleging sexual harassment and retaliation in violation of the Florida Civil Rights Act, Fla. Stat. §§ 760.01-760.11.[1] Presently before the court is MRSMC's motion for summary judgment (doc. 30; supporting documents at 31, 32, 37, 24), to which Deel has responded (docs. 43, 44, 45). For the reasons given below, the court GRANTS MRSMC's motion in part and DENIES it in part.

**BACKGROUND**

The following facts are viewed in the light most favorable to Deel or, except as

[1] Metromedia Restaurant Services Inc., ("Metromedia") removed this case from the Circuit Court in and for Escambia County, joined by MRSMC. Deel timely filed a motion to remand, which motion this court denied by order dated February 27, 2006. (Doc. 50).

In its February 27, 2006, order the court observed that MRSMC apparently had not been made a party to this action; the court also noted that the pending motion for summary judgment had been brought only by Metromedia. (See doc. 50, n. 4). On March 8, 2006, Deel moved to amend her complaint to add MRSMC as a defendant (doc. 53), which Metromedia opposed (doc. 55). The parties also filed a joint motion in which they agreed to substitute MRSMC for Metromedia ab initio as the proper defendant, however, including as to the pending motion for summary judgment. (Doc. 56). The court granted the latter motion and denied the former, as moot. (Docs. 57, 58). Accordingly, MRSMC is now the only defendant in this case (as the style of the instant order reflects) and it is its motion for summary judgment upon which the court now rules.

noted, are undisputed.[2] Deel was employed by MRSMC as a manager trainee at the Steak and Ale Restaurant in Pensacola, Florida, beginning in January 2003.[3] (Deel depo., doc. 24 at 13, 15). In approximately April 2003 Deel became a manager at the restaurant, serving as second-in-charge under the general manager who, as of October 27, 2003, was Armando Valdes ("Valdes"). (Id. at 16-17). Valdes supervised all other employees at the restaurant, including shift coordinators Trish Lord ("Lord") and Andrea Vandal ("Vandal"), both of whom were hourly employees who worked in a management capacity. (See Carter depo. at 16-17, 19; Deel depo. at 16, 38). Among others also working under Valdes were Chris Clay ("Clay"), a cook and later a kitchen manager, and Matt Cotita ("Cotita"), a manager. (Id.).

Deel asserts that during the period from November 2003 through December 31, 2003, Valdes made vulgar and sexually suggestive comments, often regarding oral sex, to her and other employees, repeatedly and on a daily basis; Valdes also engaged in sexually-charged conduct with Lord in front of Deel, including coarse bantering and inappropriate physical contact or near contact, including lascivious posturing, gesturing, and some touching.[4] (See e.g., Deel depo. at 22, 28-30, 32, 36, 42-45, 47-50; Valdes

---

[2] At summary judgment the court must view the facts in the light most favorable to the nonmoving party. See Adickes v. S.H. Kress & Co., 398 U.S. 144, 158-59, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). The court therefore does so here, drawing those facts from the pleadings, depositions, and other evidentiary materials on file. Nevertheless, the court observes that what are stated as "facts" herein for purposes of summary judgment review may not be the actual facts. See Montount v. Carr, 114 F.3d 181, 182 (11th Cir. 1997).

[3] Steak and Ale Restaurants' director of its Human Resources Department at the time relevant to this case was Chris Carter, who lived and worked in Ohio. (Carter depo., doc. 37, exh. 2 at 5). Carter testified that at the time of the events giving rise to Deel's complaint Metromedia owned several restaurant concerns, one of which was the Steak and Ale chain of sixty-three restaurants. (Id. at 8, 9, 13). In January 2004 the Steak and Ale Restaurants department had four divisions nationwide; at that time Larry DeVries ("DeVries"), who was based in Colorado, headed the eighteen-restaurant division which included the Pensacola location. (DeVries depo., doc. 37, exh. 8 at 5-6, 32). Serving under the division head was the director of operational services, who was responsible for supervising the general managers in charge of the individual restaurants. This job was held by Jeff Rettig ("Rettig") immediately prior to January 3, 2004, and by Tanya Edwards ("Edwards") after that date. (Edwards depo., doc. 37, exh. 3 at 5, 23, 118).

[4] Deel states that she made near contemporaneous entries on a calendar to record the dates of Valdes' offensive conduct but that she presently cannot locate the calendar. (Deel depo.at 26, 30).

depo., doc. 37, exh. 7 at 8, 11-12; Vandal depo., doc. 37, exh. 4 at 9-11, 13-14, 15; Lord depo., doc. 37, exh. 6 at 6-8; Clay depo. doc. 37, exh. 5 at 19). Deel asserts that Valdes consistently used such expressions as "suck my dick" when speaking with her. She contends that he also spoke in this way in her presence when addressing other persons, including managers and hourly workers. On one occasion, according to Deel, Valdes stated that he thought Vandal was "hot" and that he would like to "suck her pussy all night long." (Deel depo. at 45). Valdes acknowledges that he spoke to Lord in a vulgar manner but states that he did so jokingly and because they were friends; he also acknowledges that he and Lord engaged in inappropriate physical contact in front of others. (Valdes depo. at 12). Valdes denies that he made obscene comments to Deel or any hourly staff members other than Lord, although he also states that "[e]veryone played the same way. Even employees came and made jokes to me." (Id. at 15). Deel testified that she was offended by Valdes' conduct and that she sometimes responded to it by stopping the work she was doing and abruptly leaving the area; on other occasions she told Valdes he was "disgusting," not to speak to her or in her presence in that manner, to "shut up," or otherwise to stop such conduct. (Deel depo. at 29, 33, 42, 43-44, 48-49, 50). Valdes did not touch Deel inappropriately nor did Deel did feel physically threatened by Valdes, but she took his lewd, suggestive remarks to her "seriously," including that she perform oral sex on him in exchange for being given the day of January 1, 2004, off from work. (Id. at 18, 23, 35, 43).

Deel also testified that she received complaints regarding Valdes' conduct from numerous employees, including Vandal and Cotita. (Id. at 38-39, 48). Vandal, "upset and in tears," reported to Deel that Valdes told her she should stay in the building one night when all the other employees were gone so that he could "molest" her. (Id. at 36-41; Vandal depo. at 13, 15). Deel asked Vandal whether, if Deel reported the incident to the company's Human Resources Department, Vandal would be willing to discuss the matter; Vandal said "no." (Deel depo. at 37-38; exh. 1). Cotita complained that Valdes told him "to suck his dick during a prep shift," a comment which angered Cotita and which, he told Deel, he would not tolerate from Valdes. (Deel depo. at 38).

Clay, Lord, and Valdes testified that many of the restaurant employees, including Deel, routinely spoke with each other in a very crude fashion. Clay stated that prior to the time Valdes became manager he heard Deel use profanity as well as discuss sexual matters. According to Clay, while conversing with him and another cook, Deel stated that it had been “a while since she had had sex in the doggy position”; in another conversation in which “oral sex was brought up . . . she said it had been a while since she had had oral sex.” (Clay depo. at 32). Lord testified that Valdes used offensive language in Deel’s presence but when he did so she appeared to take it as a joke since Valdes “was laughing and so was she.” (Lord depo at 7). One time, in front of Vandal and Deel, Valdes told Lord that she should give him oral sex while they were driving to Lord’s house on an errand. Lord noted that Deel joined in the laughter over Valdes’ comment, along with Vandal and Lord, because they all thought it was “funny.” (Id. at 12). Lord described another incident in which she playfully “motioned” over Valdes’ groin but did not physically touch him; according to Lord, Deel was “playing with us as well” because at the same time Deel was “unbuttoning or trying to unbutton [another male worker’s] shirt saying she didn’t know if she could stop herself . . . . (Id. at 8). Another time, according to Lord, Deel “came in and told us that her husband would get on the internet and would go to the porn site and he didn’t need her.” (Id. at 44). Lord testified that Deel had also shared with her and Valdes that she had gone “skinny dipping with a man the night before, quoting her as saying, “Oh, I didn’t have sex with him, we just got naked.” Lord had the impression that Deel was “comfortable talking about stuff like that.” (Id. at 9). Lord stated that the inappropriate conduct among the employees “was all in fun . . . [Deel] laughed with us. She was not offended by [Valdes]. She was not afraid of him. She joked with us.” (Id. at 23). Neither Lord nor Valdes was aware of any statements or acts by Deel which would have indicated that Deel found Valdes’ conduct objectionable.[5] (Id.; Valdes depo. at 72). Lord and Valdes

---

[5] Lord also noted that under the prior general manager the environment at the restaurant had been inappropriately permissive, although not to the extent it became after Valdes’ arrival. (Lord depo.at 44-45). Vandal likewise testified that there was a lot of “joking” under both the prior general manager and Valdes but that Valdes “was just more vulgar.” (Vandal depo. at 9).

acknowledge, however, that Valdes' conduct, as well as her own and that of other employees, was inappropriate for a restaurant workplace and violative of the company's sexual harassment policy. (Lord depo. at 7, 1-20; Valdes depo. at 51, 71). Valdes admits that he permitted or condoned an atmosphere which tolerated the sexually inappropriate "jokes that happened in the restaurant between employees." (Valdes depo. at 32).

Deel admits that occasionally she used the word "fuck" at the restaurant. (Deel depo. at 71). She denies, however, that she ever engaged in or encouraged any inappropriate conduct by Valdes or Lord or otherwise participated in sexual banter at Steak and Ale. She also denies that she laughed or spoke about sexual matters at the workplace, and she contends that she let it be clearly known that she objected to sexual misconduct. (Doc. 45, Deel affidavit). Deel maintains that the allegations that she made statements regarding sexual positions and skinny dipping are false; further, she states that while she did button a male employee's shirt, it was done in the course of "correct[ing] him . . . much like a mother would button a child's shirt. I did not make any sexual or suggestive comment . . . ." (Id.).

Deel asserts that sometime in mid-December 2003 she attempted to lodge a complaint of sexual harassment against Valdes by calling the toll-free number of a hotline posted at the restaurant for this purpose. The hotline apparently was not in service at that time, however, and Deel did not make a complaint through it. (Id. at 20). Steak and Ale counters with evidence which reflects it maintained the hotline reporting service throughout 2003 and continued the service until May 2004. (Doc. 32, exhs. 16, 17).

Deel asserts that on December 27, 2005, as she was speaking with Vandal on the telephone regarding restaurant business, Valdes grabbed the receiver from Deel's hand and stated to Vandal that she needed to call back because Deel "was in the middle of sucking his dick and he was about to come." (Id. at 49-50). Deel was "upset" by the incident and told Valdes she "did not appreciate" such statements. (Id. at 50). Two days later, on December 31, 2003, Valdes took Deel aside and informed her that he intended

to place Lord in charge of the restaurant while he was away on vacation.[6] (Id. at 51, 53). Deel challenged Valdes' decision to put Lord – her subordinate – in charge in her stead and pointed to several poor managerial decisions made by Lord. Valdes then criticized Deel's work performance, citing a recently received guest complaint regarding an undercooked piece of chicken in which Deel's response reportedly was rude and unacceptable.[7] (Id. at 51-52). Valdes told her that she was not supposed to question guests about complaints but rather just make the meal complimentary and be sure the guest was satisfied. (Id. at 54). He stated that another such complaint against Deel would result in a written reprimand and the termination of her employment. (Id. at 53). Deel challenged the accuracy of the complaint and felt that her job was being unfairly threatened. (Deel depo. at 69). Valdes also advised Deel that DeVries would be visiting the restaurant during Valdes' absence and that in her discussions with him Deel should neither be too positive nor too negative about other employees; Deel understood this as meaning that she should not bring up or be honest about any problems at the restaurant. (Id. at 53). Concluding their conversation, Valdes stated "you know I love you and you WILL suck my dick," to which Deel, crying, replied that she would "never suck his dick." (Id. at 58).

During a New Year's Eve dinner at the restaurant later on December 31st, Deel's husband learned that Valdes had placed Lord in charge during his vacation and also for the first time became aware of the inappropriate sexual environment at the restaurant; in front of numerous customers, Mr. Deel became highly irate and demanded that Deel quit. (Id. at 79-80). To calm her husband and encourage him to leave the restaurant Deel, perhaps within earshot of other employees, told him she would call and report the incident

---

[6] Deel does not dispute Steak and Ale's evidence that her job title, compensation, and benefits remained unchanged throughout the time Valdes was the general manager, including the time that Lord was temporarily placed in charge of the restaurant. (Doc. 32, Carter affidavit). Valdes testified that he put Lord in charge because he and DeVries had already determined that she would become a manager due to her demonstrated ability and commitment to the restaurant. Valdes described Lord as a hard worker and someone who made good decisions. (Valdes depo. at 49-50). Lord testified that during the time she was in charge she did not treat Deel any differently than she always had. (Lord depo. at 54).

[7] Lord testified that Valdes told her that Rettig had just "chewed him out" about a "really bad" guest complaint involving Deel, which had angered Valdes. (Lord depo. at 38).

with Valdes earlier that day. (Id. at 89). During the disturbance Clay overheard Mr. Deel threaten to send Valdes and his family back to Mexico in pine boxes, which information he conveyed to Lord and Valdes the following morning, January 1, 2004. (Clay depo. at 14; Lord depo. at 33, 52).

Deel was not scheduled to work on January 1, 2004. That morning, however, she called Clay at the restaurant "asking for corporate's number, and with the tone in her voice I knew that she was highly upset about something." Clay presumed, correctly it turned out, that Deel was preparing to lodge a formal complaint against Valdes. (Clay depo. at 10). Deel proceeded to call Edwards, then a general manager at a unit in Orlando but also the incoming director of operational services. Deel reported that Valdes had selected Lord to serve as acting manager of the restaurant during his absence and also lodged a complaint of sexual harassment against Valdes.[8] (Deel depo. at 19-20, 58; Edwards depo. at 6, 8-9, 123). Although not yet installed in her new position, Edwards accepted all of the information and assured Deel that her sexual harassment complaint would be investigated. (Deel depo. at 72). Later that day Carter, the director of the company's Human Resources Department, called Deel to ask her additional questions about her complaint and to request a written statement, which Deel provided by e-mail on January 2nd.[9] (Id. at 25, 72, 93-94;

---

[8] Deel acknowledges that between her first, unsuccessful attempt to call the hotline in mid-December and contacting Edwards on January 1, 2004, she made no other efforts to lodge a complaint against Valdes. (Deel depo.at 20-21). According to Edwards, when she asked Deel why she had taken so long to report the harassment, Deel indicated that Valdes' conduct was not that "big of a deal" to her until Lord was put in charge, which upset her. (Edwards depo. at 114). Deel also indicated to Edwards at that time that "it was all fun and games for a while, but now [the conduct has] really gotten out of control and people are uncomfortable and I'm trying to speak up for everyone . . . ." (Id.).

Additionally, Deel states that she delayed reporting the harassment because she feared she would lose her job. (Deel depo. at 65). Deel maintains that Valdes intimated that the previous general manager did not like her and that her future with the company was uncertain. (Id. at 67). Valdes also told Deel and others that his prior job at Steak and Ale had been to shut down restaurants. (Id. at 68). According to Deel, Valdes had "kind of left that open" and "hanging in our minds." (Id. at 68-69).

[9] In addition to the events recited above, Deel's formal complaint also includes other instances of what she considered objectionable conduct involving Valdes and, on occasion, Lord. These incidents included: Valdes' announcing that Lord had grabbed his genitals; Deel's and Vandal's witnessing Lord rub her breasts against Valdes' head and arms; complaints from several hostesses that Valdes upset them by saying "all men cheat" and that, for example, he had solicited prostitutes in Pensacola; Valdes' "smacking" Lord on the buttocks; a complaint from a hostess that Valdes said he would like her to "do" a female server while he watched; and Lord's pressing her buttocks between Valdes' legs then "hunching up and down" in a

exh. 1). Based on her conversations with Edwards and Carter Deel believed that Valdes would not be told who had filed the sexual harassment complaint against him. (Id. at 88).

Edwards intended to speak with DeVries on January 3rd about Deel's complaint but instead she contacted him on January 2nd after Deel made a second call to her, at approximately 1:30 a.m. (Edwards depo. at 10). Deel was distraught because law enforcement officers had just been to her home to inform her husband that, based on Valdes' complaint regarding the New Year's Eve incident, he was prohibited from entering the restaurant. When Edwards contacted DeVries on January 2nd to advise him of the problems at the Pensacola unit he indicated that he was already aware of them, having received a call from Valdes earlier that day. According to DeVries, Valdes had informed him that Deel was unhappy he planned to leave Lord in charge of the restaurant and that Valdes had learned from another employee that Deel had filed a complaint regarding sexual harassment. (DeVries depo. at 9-10). At some point DeVries contacted Carter and directed him to investigate Deel's complaint. (Id. at 24). DeVries also indicated that he was aware of the incident with Deel's husband on New Year's Eve and had directed Valdes to request the issuance of a no-trespass order from law enforcement. (Edwards depo. at 15-17).

Deel reported to work on January 2nd, having been assured that Valdes would not be at the restaurant that day since he was supposed to be on vacation. Valdes was present, however, when she arrived. Vandal told Deel that Valdes planned to confront her, and one of the dishwashers told her that Valdes knew about her complaint and expected the next few days "to get ugly." (Deel depo. at 75, 88). Deel was upset at the prospect of a confrontation with Valdes and immediately telephoned Edwards. Edwards advised Deel, who was by that time "hysterical" and wanted to leave the restaurant's "hostile environment," to remain calm and professional and not to leave the premises or she would be "terminating herself" by abandoning her position. (Id. at 76-78). Shortly thereafter Valdes indicated to Deel that he wanted to speak with her and asked Clay to witness the

---

sexual motion.

meeting. During the meeting Valdes angrily stated to Deel her husband was barred from the restaurant. Deel attempted to respond but Valdes told her to "shut up" and that she was "only there to listen." (Id. at 78-79). He further stated that "'everything that had been going on was all going to be discussed'" when Carter and Edwards came into town in a few days. (Id. at 84). When Deel agreed that indeed it would be, Valdes "screamed" at her to get back to work. Deel did so, with Valdes standing nearby "glaring" at her. (Id.). Deel eventually had an opportunity to call Carter, who assured her he would conduct an investigation when he arrived in Pensacola. (Id. at 86). Deel also returned a call to DeVries, during which she complained that Carter and Edwards had told her Valdes would not be told who had lodged the complaint against him but in fact not only was he aware that she had made it but also he had challenged her about it. According to Deel, DeVries told her that he had informed Valdes of her complaint. (Id. at 89). DeVries also stated to Deel that he could not comment on the events but he did indicate that he had spoken with Valdes about the complaint; additionally, DeVries agreed that Valdes would be required to stay away from the restaurant until Carter's investigation had been completed. (Id. at 89-92). DeVries also e-mailed Deel on January 3rd, evidently in response to Deel's written statement to Carter, acknowledging that she was upset and asking that she give the company a few days to try to resolve the matter. (Id. at 94).

On January 6, 2004, Carter was in Pensacola to investigate Deel's sexual harassment complaint; his investigation included interviews with fifteen employees, including one with Deel that lasted for several hours. (Id. at 95-6; Carter depo, at 43-45; doc. 32, Carter affidavit). Carter found substantiation for several of Deel's allegations and noted such violations of the harassment policy as the use of profanity, sexual banter, and graphic sexual conversations. (Carter depo. at 41). He believed that Valdes had not been entirely truthful in answering his questions and that other employees, including Deel, had also violated the sexual harassment policy. (Id.). Carter and DeVries concluded that a pervasive atmosphere of sexual harassment existed at the restaurant which the company could not tolerate. (Id. at 49; Carter affidavit; DeVries depo. at 25-27). Based on Carter's report DeVries determined that the problem was so pervasive that virtually every employee

at the restaurant would have to be fired in order to comply with the company's sexual harassment policy; however, in DeVries' view that approach was not viable as a business matter. (DeVries depo. at 57).

Edwards arrived in Pensacola on the 9th of January and first met with Valdes. According to Valdes, Edwards indicated that she would attempt to work out an arrangement with Deel whereby Deel would agree to continue to work with Valdes; if Edwards were unsuccessful, however, Valdes was not "going to be able to work for that restaurant" anymore. (Valdes depo. at 33-34). Edwards later met with Deel for approximately three hours. (Deel depo. at 97). Deel felt that Edwards initially was sympathetic but then became somewhat dismissive of her allegations as "baby stuff" and a waste of the company's time. Deel rejected any suggestion by Edwards that the situation with Valdes could be smoothed over so that they could return to work together. (Id. ). When Deel threatened to resign if Steak and Ale did not discharge Valdes, Edwards indicated that he would be fired. (Id. at 99). DeVries arrived in Pensacola on the 10th of January and met with Valdes, at that time officially relieving Valdes of his duties as general manager of the Pensacola Steak and Ale. (DeVries depo. at 35). DeVries told Valdes that he would no longer allow him to work in his division but left open the possibility that Valdes' prior division director would find a position for him in another locale. (Id. at 37). DeVries testified that he met with the restaurant employees to inform them that he had asked Valdes to "step down" from his position because he had "not prevented an atmosphere that tolerated inappropriate sexual activities." (Id. at 36). According to Clay, however, he and other employees were given the impression, perhaps from information provided by Edwards, that Valdes had been fired. (Clay depo. at 29). In any event, shortly after his dismissal Valdes was transferred, with his moving expenses paid by the company, to a Steak and Ale restaurant in Baltimore, Maryland. Valdes was employed as a salaried kitchen manager, a job which was a demotion from his prior position as general manager of the Pensacola unit; his base pay did not change but the bonuses were less than he previously had received. (Valdes depo. at 39-42, 67). Acknowledging his conduct in Pensacola, Valdes stated that by being demoted or transferred he "got what [he]

deserved." (Id. at 62).

After Valdes' departure Deel remained in her position as a manager and Lord was promoted to co-manager, in a trainee position. (DeVries depo. at 51; Edwards depo. at 90; Carter depo. at 21). Vandal was elevated from part-time to full-time coordinator (Vandal depo. at 5), and Clay was promoted to part-time coordinator (Clay depo. at 9-10). The general manager position was left unfilled, with Edwards acting as supervisor and providing support from her location in Orlando, Florida. (Edwards depo. at 66). In mid-January 2004, Edwards had four meetings with the employees at the Pensacola Steak and Ale to review the company's sexual harassment and other employment policies. (Edwards depo. at 109). (Deel depo. at 104-05). As part of the training session Deel and other employees were required to sign a sexual harassment policy acknowledgment and agreement to abide by the policy. (Id. at 105; exh. 7). Edwards specifically addressed the need for managers to set the proper tone at the restaurant and instructed that they must immediately put a stop to any inappropriate conduct or language. (Edwards testimony, Unemployment Hearing Transcript at 35). Lord testified that she and Deel were informed that they needed to change the environment at the restaurant so that the sort of conduct which had occurred before did not continue. (Lord depo. at 43). Edwards also conducted a separate meeting with Deel and Vandal at which she outlined in detail the various infractions for which their employment could be terminated. (Deel depo. at 102-103). Deel felt that Edwards in effect was telling her and Vandal that they were going to be fired. (Id. at 107-08). Edwards considered her admonitions to be a "warning" to Deel and Vandal that any further conduct in violation of the company's sexual harassment policy would result in their dismissal. (Edwards testimony, Unemployment Hearing Transcript at 15-17, 20). Carter likewise understood Edwards to have "made it abundantly clear [to Deel, Vandal, and Lord] that we're not going to tolerate it . . . since [Valdes] was the leader we took the adverse employment action on him and warned him. With Ms. Deel, we warned that we're not going to tolerate this." (Carter depo. at 53). Additionally, DeVries made it clear to Deel that she was not then and would never be the general manager of the Pensacola restaurant. DeVries also told Deel that he did not want to hear anything more about the

situation with Valdes, which Deel took to mean that she should not pursue the matter with the Florida Commission on Human Relations or any other entity. (Deel depo. at 108-09).

According to Deel, in mid-February 2004 she was at work in the restaurant's office attempting to contact a restaurant employee named Jamal. The office is located in a private area of the building where persons in the dining or bar areas cannot overhear speakers. Another employee, Heidi Fischler ("Fischler"), came into the office and informed Deel that Jamal would not be returning to work, which led to Fischler's telling Deel that the two were dating. During this conversation Vandal entered the office. Deel states that Vandal heard Fischler blurt out that she and Jamal were having "the greatest sex [Fischler] had ever had" and that Jamal was "hung like a horse." (Deel depo. at 111). According to Deel, she turned to Vandal and asked only if she knew that Fischler and Jamal were "dating." Vandal responded that she knew all about it; all three women "giggled" and then left the office. (Id. at 111-112; Deel testimony, Unemployment Hearing Transcript at 50). Deel maintains that this was the extent of the conversation and that she was not involved in any other similar conversations with Fischler regarding Jamal outside the privacy of the restaurant's office.

Edwards called Deel on February 27, 2004, while Deel was on vacation, to inquire what Deel knew about an incident which had occurred a number of days earlier. Edwards informed Deel that a guest had complained that while seated at a table in the lounge she had overheard two females, one of whom Edwards had already identified as Fischler, talking inappropriately and gesturing about a sex partner's penis size.[10] Deel indicated she had been on vacation at the time and did not know who the person speaking with Fischler

---

[10] Edwards testified that a customer, who chose not to identify herself, called the restaurant to complain about the behavior of two employees, and Edwards fielded the call. (Edwards depo. at 61-2, exh. 4). The customer told Edwards that she heard two employees in the lounge area talking about the size of a sex partner's "dick." (Edwards depo. at 62-64). According to Edwards, the customer described one of the participants in the conversation as being "shorter and heavyset with a bleached blond, very short, boy haircut." Edwards determined that this description fit only one employee, Fischler. The customer described the second individual as "another girl with long, dark, wavy hair." Edwards could not identify this person from the description. She later concluded it likely was Deel, based on what the guest and Fischler told her, although she could not be absolutely certain. (Id. at 99). In her deposition Edwards conceded that the bartender may have fit the description of the "girl" with "long, dark wavy hair" given by the customer. (Id. at 108-09).

in that location might have been. Edwards stated that they would discuss the matter further when Deel returned to work on March 1, 2004. (Deel depo. at 115-16). As part of her investigation into the incident, Edwards spoke with Fischler, who confirmed that she and Deel had engaged in a conversation about Jamal. According to Edwards, Fischler reported that the two of them had "got to laughing and joking and Chantal was asking her questions and she was answering." (Edwards depo. at 83). Fischler also indicated to Edwards that she and Deel had talked about Jamal "throughout the restaurant, that they giggled and laughed about it throughout the night." (Id. at 84). Edwards stated that she learned from Vandal that Vandal had walked into the office and heard Deel and Fischler talking about how much Fischler enjoyed having sex with Jamal and that he had a large penis. (Id. at 71). According to Edwards, Vandal also told her that Deel said, "Hey, Andrea, Andrea, you've got to hear this. Jamal's dick is this big" and used her hands to demonstrate the size of the penis. (Edwards testimony, Unemployment Hearing Transcript at 29-30). Vandal provided a statement to Edwards regarding the incident in which she stated that she walked into the office and heard Deel and Fischler "talking and giggling" about Jamal. Vandal noted that Deel asked her if she knew about Fischler and Jamal; as Vandal shook her head and turned to walk away, "they continued to talk and giggle." (Vandal depo. at 25, exh. 1). Also during Edwards' investigation into the guest complaint, Lord reported that she overheard a discussion of a sexual nature between Deel and Fischler about Jamal, this time near the pass-through window from the kitchen, and that she had observed Fischler making a "humping" motion. Edwards acknowledged that this area was not near the lounge, however, and thus could not have been the conversation the customer heard. (Edwards depo. at 75).

DeVries and Edwards met with Deel when she returned to work on March 1, 2004. In response to their questions regarding the Fischler incident, Deel described a single, brief conversation in the restaurant's office when Fischler spontaneously volunteered information about having sex with Jamal, and Deel participated only by asking Vandal if she knew Fischler and Jamal were dating. (Deel depo. at 116). According to Edwards, Deel indicated she was trying to be friendly, to be a good manager or counselor because

Fischler had not had a date in a very long time and was "very excited because it was very good sex." (Edwards testimony, Unemployment Hearing Transcript at 15-17, 20; Deel testimony at 51). Edwards reported that as Deel delivered this information she was "smiling and had a sparkle in her eyes." (Edwards depo., exh. 4). In response, DeVries and Edwards stated that Deel's conversation with Fischler was a violation of the restaurant's sexual harassment policy, and DeVries terminated Deel's employment, effective immediately.

Edwards testified that the customer's complaint about what she overheard in the bar area of the restaurant was not the cause of Deel's being fired. Rather, according to both Edwards and Carter, Deel was fired because she admittedly had been involved in an inappropriate conversation of a sexual nature with an hourly employee; this conversation was in violation of the company's sexual harassment policy, as to which only six weeks prior Deel had received additional, particularized instruction and a warning. (Edwards depo. at 99; Edwards testimony, Unemployment Hearing Transcript at 15-17; Carter depo. at 51-52; Deel depo. at 116-117). Vandal and Lord received verbal warnings, later memorialized in writing, for failing to report the inappropriate conversation each overheard and immediately to put "a halt to this kind of sexual banter," as the restaurant's sexual harassment policy required. (Edwards depo., exh. 4). Fischler was given a written reprimand. (Id. at 104-05). Several months after Deel was fired Lord was promoted to the position of general manager of the restaurant, a job she still held at the time of her deposition in August 2005. (Id. at 90). On March 3, 2004, Deel made a sworn charge of discrimination to the Florida Commission on Human Relations. (Deel depo, exh. 6). She also applied for unemployment benefits, but her application was denied by the appeals referee and on appeal. (See doc. 32, Appeals Referee decision and Order of Unemployment Appeals Commission).

Steak and Ale's Sexual Harassment and Disciplinary Policies

Valdes testified that he began working for Steak and Ale in its Raleigh, North Carolina, unit in approximately 1998. He assumed, but did not specifically recall, that during his employee orientation he had signed an acknowledgment that he had read,

understood, and would follow the company's sexual harassment policy. (Valdes depo. at 21-22, 25-26, 28). During Deel's employee orientation in January 2003 she sat with others and took turns reading materials which included the sexual harassment policy. (Id. at 62-63). Deel also made a written acknowledgment that she had read and understood a document entitled "Sexual Harassment in the Work Place," which outlined Steak and Ale's sexual harassment policy. (Deel depo. at 62; exh. 3). This booklet, which was directed to managers and supervisors, describes prohibited conduct and explains the procedure for lodging a complaint. In part, after discussing what conduct may constitute sexual harassment and how a complaint should be investigated, the booklet directs that "[a]ny employee who is subjected to or observes [sexual harassment] is to contact his/her supervisor or any other supervisor or member of management or Human Resources. The Company will investigate the matter and take appropriate action." (Id.). This booklet did not list a toll-free number as a reporting option. (Deel depo. at. 62; exh. 3). The September 2000 edition of Steak and Ale's "Team Member Handbook and Orientation Guide," a sexual harassment policy guidebook for employees which also was used during Deel's tenure, did contain a toll-free number for reporting harassment. In part the Guide states:

> If you believe that you have been harassed by a co-worker, supervisor, or Guest, immediately report the incident to your manager, Area Director, Human Resources Manager, or Regional Vice President. You may also contact the Human Resources Department at Steak and Ale Restaurant Support Center in Plano, Texas at 972-588-5735 or call The Network at 1-800-241-5689. We will investigate any inappropriate actions or behavior in a timely and confidential manner.

(Doc. 32, att. to Edwards affidavit).

This toll-free number was also posted on a bulletin board at the Pensacola Steak and Ale. (Carter depo. at 58-60; Deel depo. at 20). According to the operator of The Network, the toll-free number was operational and a reporting option for Steak and Ale employees throughout 2003 and until May 2004. (Doc. 32, affidavit of Diane Folio).

Clay testified that Steak and Ale's had a progressive disciplinary policy which "typically . . . would entail counseling, written reprimand, and dismissal. (Carter depo. at 15). Similarly, according to Clay, the restaurant's sexual harassment policy generally was

not enforced on a “zero tolerance” basis such that a violation of any aspect of the policy would result in termination. (Id. at 27).

**SUMMARY JUDGMENT STANDARD**

A motion for summary judgment should be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56; Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). A factual dispute is "`genuine' if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 LED. 2d 202 (1986). A fact is "material" if it "might affect the outcome of the suit under the governing [substantive] law." Anderson, 477 U.S. at 248; Tipton v. Bergrohr GMBH-Siegen, 965 F.2d 994, 998 (11th Cir. 1992). The court must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in the nonmoving party's favor. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). “If reasonable minds could differ on the inferences arising from undisputed facts, then a court should deny summary judgment.” Miranda v. B & B Cash Grocery Store, Inc., 975 F.2d 1518, 1534 (11th Cir. 1992) (citation omitted). Nevertheless, a general denial unaccompanied by any evidentiary support will not suffice. See, e.g., Courson v. McMillian, 939 F.2d 1479 (11th Cir. 1991); Hutton v. Strickland, 919 F.2d 1531 (11th Cir. 1991). Furthermore, the court is not obliged to deny summary judgment for the moving party when the evidence favoring the nonmoving party is merely colorable or is not significantly probative. See Anderson, 477 U.S. at 249. Indeed, the existence of a scintilla of evidence in support of the nonmovant's position is insufficient; the test is "whether there is [evidence] upon which a jury could properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed." Anderson, 477 U.S. at 252. The moving party has the initial burden of showing the absence of a genuine issue as to any material fact. Adickes, 398 U.S. at 157; Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115 (11th Cir. 1993). Once the movant satisfies

its burden of demonstrating the absence of a genuine issue of material fact, the burden shifts to the nonmovant to "come forward with 'specific facts showing that there is a genuine issue for trial.'" Matsushita Elec. Indus. Co., 475 U.S. at 587 (emphasis omitted). Otherwise stated, the nonmovant must "demonstrate that there is indeed a material issue of fact that precludes summary judgment." Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991).

**DISCUSSION**

Count One: Sexual Harassment

Claims of employment discrimination brought pursuant to the FCRA are construed in the same manner as claims brought pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2. See Harper v. Blockbuster Entertainment Corp., 139 F.3d 1385, 1387 (11th Cir. 1998) (indicating that FCRA is subject to Title VII analysis because FCRA was modeled after Title VII). Accordingly, because "federal case law dealing with Title VII is applicable to employment discrimination claims brought under Florida law," such claims may be analyzed solely by reference to cases interpreting Title II. See Maniccia v. Brown, 171 F.3d 1364, 1368 n.2 (11th Cir. 1999).

Sexual harassment is a form of sex discrimination prohibited by the FCRA. See Harper, 139 F.3d at 1387. In order to establish a prima facie case of sexual harassment involving a hostile work environment, an employee must establish that: 1) she belongs to a protected class of individuals; 2) she was subjected to unwelcome sexual harassment, such as sexual advances, requests for sexual favors, or other conduct of a sexual nature; 3) the harassment complained of was based on the sex of the employee; 4) the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and 5) there is a basis for holding the employer liable. See Hulsey v. Pride Restaurants, LLC., 367 F.3d 1238 (11th Cir. 2004); Mendoza v. Borden, Inc., 195 F.3d 1238, 1245 (11th Cir. 1999) (en banc).

Steak and Ale does not dispute that Deel has established that she belongs to a protected class of individuals, was subjected to unwelcome sexual harassment, or that the

complained-of harassment was based on her sex. The court therefore proceeds to consideration of the fourth and fifth elements of Deel's sexual harassment claim.

Severity or Pervasiveness of the Alleged Sexual Harassment

The United States Supreme Court has commented that the "severe or pervasive" inquiry is "crucial" and that neither judges nor juries should mistake "ordinary socializing in the workplace – such as male-on-male horseplay or intersexual flirtation – for discriminatory conditions of employment." Onacle v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 81, 118 S.Ct. 998, 1003, 140 L.Ed. 2d 201 (1998) (internal quotations omitted). The Court's test is disjunctive, see Pennsylvania State Police v. Suders, 542 U.S. 129, 133, 124 S.Ct. 2342, 159 L.Ed.2d 204 (2004); National R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 116, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002), and either element provides an independent ground for finding a hostile work environment. See Jensen v. Potter, 435 F.3d 444 (3d Cir. 2006); Harvill v. Westward Communications, LLC, 433 F.3d 428, 434-35 (5th Cir. 2005); Hostetler v. Quality Dining, Inc., 218 F.3d 798, 808 (7th Cir. 2000); Witt v. Roadway Express, 136 F.3d 1424, 1432 (10th Cir. 1998); see also 2 Charles A. Sullivan, Michael J. Zimmer & Rebecca Hanner White, Employment Discrimination Law and Practice 455 (3d ed. 2002) ("The disjunctive phrasing means that 'severity' and 'pervasiveness' are alternative possibilities: some harassment may be severe enough to contaminate an environment even if not pervasive; other, less objectionable, conduct will contaminate the workplace only if it is pervasive."). In addition, "[e]stablishing that harassing conduct is sufficiently severe or pervasive to alter an employee's terms or conditions of employment includes a subjective and an objective component." Mendoza, 195 F.3d at 1246 (citing Harris v. Forklift Systems, Inc., 510 U.S. 17, 21-22, 114 S.Ct. 367, 126 L.Ed. 2d 295 (1993)); see also Gupta v. Florida Board of Regents, 212 F.3d 571, 583 (11th Cir. 2000). As to the subjective component, the employee must "subjectively perceive" the harassing behavior as being sufficiently severe or pervasive to alter the terms or conditions of her employment. See Mendoza, 195 F.3d at 1246 (citing Harris, 510 U.S. at 21-22, 114 S.Ct. 367). This subjective perception, however, must be objectively reasonable. See id. The objective component involves a fact intensive inquiry; "[t]he

[work] environment must be one that a reasonable person would find hostile or abusive, [which] should be judged from the perspective of a reasonable person in the plaintiff's position, considering all of the circumstances." Id. (quoting Onacle, 118 S.Ct. at 1003). The Supreme Court has identified four factors that courts should consider when evaluating the objective reasonableness of the alleged harassment: "(1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance." Id. "[District] courts should examine the conduct in context, not as isolated acts, and determine under the totality of the circumstances whether the harassing conduct is sufficiently severe or pervasive to alter the terms or conditions of the plaintiff's employment and create a hostile or abusive working environment." Id.

In the instant case, with respect to the subjective component the court concludes that Deel has come forward with evidence sufficient to create a genuine issue of fact as to whether she perceived Valdes' harassing behavior as severe or pervasive. In opposing summary judgment Deel vigorously disputes the testimony from Clay and Lord that Deel discussed inappropriate sexual matters in the workplace. Further, Deel insists that she never engaged in or encouraged any misconduct or sexual banter at Steak and Ale and did not laugh at or consider Valdes' conduct humorous. This is contrary to Clay's testimony that Lord participated in sexual banter; it is also contrary to Lord's testimony that Deel appeared to take Valdes' offensive conduct as a joke and that Deel herself joined in the conduct at times, such as "playfully" manipulating a button on a male employee's shirt. Accordingly, the court is satisfied that Deel has met her summary judgment burden with respect to establishing that, from a subjective perspective, Valdes' harassing conduct was sufficiently severe or pervasive to alter the terms or conditions of her employment.[11] See

---

[11] Steak and Ale correctly points out that Deel failed to report Valdes' offensive conduct for approximately two months after she says it began and then only when Valdes advised her that he planned to put Lord in charge of the restaurant instead of her. While, as Steak and Ale contends, the timing of Deel's complaint may "undermine" her argument that she in fact perceived Valdes' conduct as hostile, this would be a question for the jury.

Mendoza, 195 F.3d at 1246.

The court turns next to the objective component. Under the law of this circuit, it is doubtful that Valdes' conduct was so offensive as to be considered severe, and the court declines to make such a finding.[12] Nevertheless, although it is a close question, the court concludes that Deel has come forward with sufficient evidence to survive summary judgment on the issue of pervasiveness. The court is persuaded that a rational jury could find that the alleged harassment was sufficiently pervasive to create an objectively hostile work environment. See Smith v. Northwest Financial Acceptance, Inc., 129 F.3d 1408, 1415 (10th Cir. 1997) (noting that pervasiveness inquiry for the trier of fact begins with analysis of the "number, sequence, and timing of the conduct . . . [and] then looks at the nuances of an environment that is imposed by each instance of discriminatory behavior"). Indeed, the evidence in this case reflects that an atmosphere of inappropriate sexual behavior – engaged in and effectively encouraged by Valdes – permeated the Steak and Ale restaurant. See Allen v. Tyson Foods, 121 F. 3d 642, 647 (11th Cir. 1997) (holding that genuine issue of material fact existed as to the abusiveness of poultry processing plant due to evidence that atmosphere of inappropriate sexual behavior may have permeated the workplace). Valdes admitted as much. Furthermore, based on Carter's investigation and report, DeVries voiced the same conclusion. Valdes, as well as Lord, also acknowledged that their behavior was violative of the company's sexual harassment policy. Additionally, the evidence is sufficient to support that Valdes' offensive conduct – which occurred, according to Deel, on virtually a daily basis throughout his two-month stint as general manager – was frequent. Moreover, there is evidence that Valdes' comments were humiliating to Deel and interfered with her job performance. In sum, the court finds that

---

[12] The Eleventh Circuit has rejected sexual harassment claims based on conduct that appears to have been significantly more flagrant than the conduct at issue in this case. See, e.g., Gupta, 212 F. 3d at 584-86 (determining that supervisor's sexual comments to plaintiff, lifting hem of plaintiff's skirt four inches, placing his hand on the inside of plaintiff's thigh, staring at plaintiff, repeated invitations to lunch, and once touching plaintiff's ring and bracelet did not rise to level of severe or pervasive conduct); and Mendoza, 195 F. 3d at 1247 (finding that female employee's allegations that her supervisor followed her, looked at her groin and sniffed, and brushed his hip against hers were not severe or pervasive enough to constitute actionable sexual harassment).

Deel has met her burden of establishing a genuine issue of fact as to whether, given the totality of the circumstances, the harassing conduct at the restaurant was sufficiently pervasive to alter the terms or conditions of her employment and create a hostile or abusive working environment. See Allen, 121 F. 3d at 647.

Basis for Holding Steak and Ale Liable

The Eleventh Circuit has instructed that there are two theories of liability pursuant to which a plaintiff may establish a basis for the employer's vicarious liability for her sexual harassment claim, hostile work environment and tangible employment action. See Cotton v. Cracker Barrel Old County Store, Inc., 434 F.3d 1227, 1231 (11th Cir. 2006) (citation omitted). Accordingly, in "analyzing whether an employer should be held [vicariously] liable for a supervisor's harassment, courts should separate these cases into two groups: (1) harassment which culminates in a 'tangible employment action,' such as discharge, demotion, or undesirable reassignment, and (2) harassment in which no adverse 'tangible employment action' is taken but which is sufficient to constructively alter an employee's working conditions." Frederick v. Sprint/United Management Co., 246 F.3d 1305, 1311 (11th Cir. 2001) (internal citations omitted); see also Walton v. Johnson & Johnson Services., Inc., 347 F.3d 1272, 1280-1281 (11th Cir. 2003) (per curiam); Johnson v. Booker T. Washington Broadcasting Serv., Inc., 234 F.3d 501, 509-10 (11th Cir. 2000). An employer is strictly liable for sexual harassment by a supervisor that falls into the first category. Walton, 347 F.3d at 1280-1281. The employer may escape liability with respect to sexual harassment by a supervisor that falls into the second category by satisfying the affirmative defense set forth in Faragher v. City of Boca Raton, 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998) and Burlington Industries v. Ellerth, 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998). Id.

In this case, Deel argues that Steak and Ale is strictly liable for Valdes' conduct because she suffered a tangible employment action in the form of Valdes' putting Lord in charge of the restaurant in his absence.[13] (Doc. 43 at 12). Alternatively, even absent proof

[13] To the extent Deel's allegation that Valdes suggested she perform fellatio on him in exchange for having January 1, 2004, off from work implicates a separate basis for liability under the tangible employment

of a tangible employment action, Deel contends that Steak and Ale nevertheless is liable because it has failed to demonstrate its entitlement to the Ellerth-Faragher affirmative defense. (Id. at 18-23.) Steak and Ale contends that Deel did not suffer a tangible employment action causally related to any sexual harassment by Valdes and that it may therefore rely on – and has proven it is entitled to rely on – the Ellerth-Faragher affirmative defense. (Doc.31 at 2).

1. Tangible Employment Action

The Supreme Court has defined a "tangible employment action" as "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." Ellerth, 524 U.S. at 761; see also C. Geoffrey Weirich, Employment Discrimination Law, p. 616 (3d ed. 2002 Cumulative Supplement). In Ellerth the Court also noted that "a less distinguished title" or "other indices that might be unique to a particular situation" could also be a tangible employment action. Id. (quoting Crady v. Liberty Nat. Bank & Turst Co. Of Ind., 993 F. 2d 132, 136 (7th Cir. 1993)). "In other words, it is the type of action a supervisor would normally take (an 'employment action') and its effect on the victim must be tangible." C. Geoffrey Weirich, Employment Discrimination Law, p. 616 (3d ed. 2002 Cumulative Supplement) (emphasis in original). "A tangible employment action in most cases inflicts direct economic harm." Ellerth, 524 U.S. at 761-62.

For the following reasons the court concludes that Deel has failed to establish that she was subjected to a tangible employment action as a result of Lord's selection as acting manager of the restaurant in Valdes' absence. At most Lord was in charge for ten days, or from about January 1, when Valdes was scheduled to depart on his vacation, through January 10, 2004, when he was relieved of his position; Lord and Deel thereafter became "co-managers." The period of time during which the selection was in effect was brief, Deel

---

action theory, the court concludes it is without merit. Being denied a desired day off from work does not rise to the level of altering the terms and conditions of Deel's employment. Moreover, the evidence is uncontroverted that Deel suffered no job detriment as the result of rejecting Valdes' sexual harassment, i. e., she was not required to work that day.

continued to work as manager of the restaurant, and her compensation was unaffected. See Bowman v. Shawnee State University, 220 F.3d 456, 461-62 (6th Cir. 2000) (holding that temporary removal of university instructor from his position as sports studies coordinator did not rise to the level of an adverse employment action because removal was for only ten days, the employee maintained his position as a full-time university instructor, and he never lost any income). Lord's being the sole person in charge of the restaurant also was a transitory matter. See Brooks v. City of San Mateo, 229 F.3d 917, 930-31 (9th Cir. 2000) (noting that in order for a tangible employment action to be actionable it must be sufficiently final). Significantly, Valdes was not involved in firing Deel.[14] See Walton, 347 at 1282, n.7 (concluding that there was no evidence that harassing supervisor "played a role in the decision to terminate" plaintiff who had argued that discharge was the culmination of her supervisor's sexual harassment). Moreover, Valdes' selection of Lord to be in charge of the restaurant temporarily was not in fact a promotion; thus his failure to select Deel for the job was not equivalent to a failure to promote. Nor did Valdes reassign Deel to a position with significantly different responsibilities; her duties during the time Lord was in charge remained the same. Also, there is no evidence that Valdes made a decision that resulted in any change in Deel's benefits, gave her a less distinguished title, reduced her work hours, or caused her to have additional work or less desirable work. In short, Valdes' choosing Lord instead of Deel to head the restaurant while he was on vacation was not an act significant enough to have had a "tangible" effect on Deel's employment. See Zaffuto v. City of Hammond, 308 F.3d 485, 493 n.8 (5th Cir. 2002) (rejecting in Title VII retaliation cause a police officer's assertion that denial of opportunity to be "acting shift lieutenant while his supervisor was on vacation" as "far too minor to constitute an ultimate employment action.").

Additionally, Deel has presented no evidence, but rather only conjecture, to support that Valdes selected Lord because Deel had rejected his sexual overtures. Thus there is

---

[14] It is undisputed that Valdes, who by March 1, 2004, no longer worked in DeVries' division, did not take part in the decision to terminate Deel's employment. (See doc. 32, affidavits of Edwards, DeVries , and Carter; Valdes depo. at 41).

no support for establishing a causal connection between Valdes' harassment of Deel and his decision to place Lord in charge of the restaurant. The evidence of record reflects that Valdes selected Lord for performance reasons and because Rettig had just dressed him down about Deel's response to a customer complaint. Furthermore, even if the court concluded that Valdes had taken a tangible employment action against Deel by selecting Lord, there is no evidence that he did so because of Deel's gender. See Walton, 347 F.3d at 1283 (holding that even if supervisor took tangible employment action against employee, defendant was not deprived of affirmative defense because there was no evidence the action was taken because of plaintiff's gender).

For the foregoing reasons the court concludes that Deel has failed to satisfy her burden of showing the existence of a genuine issue of material fact with respect to whether Valdes took any tangible employment action against her. Accordingly, Steak and Ale is entitled to rely on the Ellerth-Faragher affirmative defense.

2. Ellerth-Faragher Affirmative Defense

The Ellerth-Faragher defense contains two elements: "(a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." Faragher, 524 U.S. at 807; see also Frederick, 246 F.3d at 1313. The employer bears the burden of demonstrating both elements of the defense by a preponderance of the evidence. Faragher, 524 at 807.

a. Reasonable Care to Prevent and Correct Promptly Sexual Harassment

An employer exercises reasonable care to prevent sexual harassment when it promulgates and effectively disseminates to its employees an anti-harassment policy containing no fatal defects. Madray v. Publix Supermarkets, Inc., 208 F.3d 1290, 1296-97 (11th Cir. 2000) (citation omitted); Frederick, 246 F.3d at 1314. With respect to the"reasonable care to correct" element, the employer need not respond instantaneously to a complaint of sexual harassment but rather reasonably promptly, Frederick, 246 F.3d at 1313-14; the Eleventh Circuit has "noted that the employer's notice of the harassment

is of paramount importance [because] if the employer had notice of the harassment . . . then it is liable unless it took prompt corrective action." Madray, 208 F. 3d at 1299 (quoting Dees, 168 F. 3d at 422) (internal quotations omitted). "This inquiry is facilitated by the identification of the appropriate [c]ompany representative to whom employees should register their complaints in the [company's] sexual harassment policy." Id. at 1299-1300.

In this case, Deel asserts that Steak and Ale did not have a readily accessible and vigorously enforced anti-harassment policy.[15] (Doc. 43 at 14-17) (citing Suders, 542 U.S. at 134). Steak and Ale responds that it took reasonable steps to prevent sexual harassing conduct through an anti-harassment policy which was widely publicized to its employees, including Deel, and that it acted quickly to correct the sexual harassment when Deel reported it.

Deel acknowledges that during her employee orientation she sat with others and read from materials which included the company's anti-harassment policy. Deel also signed an acknowledgment that she had read, reviewed, and understood the "Sexual Harassment in the Work Place" booklet directed to managers which described prohibited conduct and included the complaint procedure for reporting sexual harassment. In addition, during the time of Deel's employment Steak and Ale had a general anti-harassment policy which was included in the "Team Member Handbook and Orientation Guide" provided to Deel. The Guide was a sexual harassment policy handbook for employees which set out the complaint procedure and provided a hotline telephone number as well as the number of Steak and Ale's Human Resources Department for making complaints. The policy

---

[15] According to Deel, there is at least a genuine issue of fact as to whether the hotline for reporting complaints posted at the restaurant, which was the procedure which she elected to utilize, was operational at the time she attempted to call in mid-December 2003. As discussed below, the court assumes for summary judgment purposes that the hotline was not operational.

The court finds no merit in Deel's contentions that Steak and Ale did not vigorously enforce its "purported" sexual harassment policy, as evidenced by Edwards' "claim[ ] she was not the proper recipient" to take Deel's complaint on January 1, 2004, her refusal to act instantaneously, and DeVries' advice to Valdes to call law enforcement regarding Deel's husband. Moreover, as to Deel's complaints that Edwards attempted to get her to agree to Valdes' returning to his position and that Valdes was not fired but rather transferred to another location, the court agrees with Steak and Ale that these arguments are not material to the issues whether it acted reasonably to prevent and to correct promptly the alleged harassment. Deel's argument that Steak and Ale did little to punish Lord and others who also had violated the sexual harassment policy is discussed below in connection with her retaliation claim.

provided alternative means of lodging a complaint other than through the harassing supervisor, and the policy also included avenues for complaint which were outside the supervisory chain of command. Madray, 208 F.3d at 1299.

The court concludes that Steak and Ale has established that it exercised reasonable care to prevent harassment through its promulgation and effective dissemination of its anti-harassment policy and complaint procedures. Madray, 208 F.3d at 1296-97. This conclusion is not altered by Deel's allegation, accepted as true for summary judgment purposes, that the toll-free number was not operational when she first attempted to complain about Valdes in mid-December 2003. The general anti-harassment policy for employees, with which Deel admittedly was familiar, contained not only the number of the toll-free hotline but also the number for Steak and Ale's Human Resources Department. Deel had the option of calling the latter number or otherwise contacting designated persons other than her supervisor or those in the chain of command in order to lodge her complaint. Indeed, when Deel decided to pursue a complaint she called Edwards, who at the time was the general manager of another Steak and Ale and not in Deel's supervisory chain of command. Furthermore, as early as mid-November 2003, when Deel asked Vandal whether she would be willing to complain about Valdes if Deel made the call, Deel recognized that calling the company's Human Resources Department was an available and appropriate course of action for reporting Valdes' conduct. Given the clear availability of alternate reporting options, of which Deel was aware, the court finds no basis for concluding that Steak and Ale's sexual harassment policy contained any fatal defect with respect to the procedures for reporting complaints. Frederick, 246 F.3d at 1314.

Next, the court considers whether Steak and Ale acted promptly to correct the complained-of sexual harassment. Deel acknowledges that the last time she experienced harassment by Valdes was December 31, 2003. Deel first reported the conduct the following day, January 1, 2004, to Edwards; as Edwards at the time was a member of management, under the sexual harassment policy she was an appropriate person to receive Deel's complaint. By January 3, 2004, Deel had been contacted by Carter to obtain additional information in order to commence an investigation and by DeVries to

acknowledge Deel's complaint and request a few days in which to try to resolve the matter. DeVries also agreed to Deel's request that Valdes not be permitted to return to the restaurant until the inquiry into her complaint had been concluded. Carter arrived in Pensacola on January 6, 2004, and immediately conducted an investigation which included interviewing some fifteen persons, including Deel. Within a few days Edwards also came to Pensacola and participated in the resolution of the complaint, as did DeVries. On January 10, 2004, DeVries officially relieved Valdes of his position at the Pensacola unit. Under these facts, the court is satisfied that Steak and Ale has demonstrated that it "exercised reasonable care . . . [to] correct promptly" any sexually harassing behavior by Valdes. Faragher, 524 U.S. at 807.

b. Unreasonable Failure to Take Advantage of Preventive or Corrective Opportunities Provided by Employer to Avoid Harm Otherwise

The second element of the Ellerth-Faragher affirmative defense requires the employer to prove not only that the employee failed to avail herself of the employer's sexual harassment policy but also that such failure was unreasonable.

Deel maintains that she complied with the company's posted sexual harassment policy "to the letter" by calling the toll-free hotline. Her attempt ended in failure, however, through no fault of her own because the reporting service was not available, and the harassment continued. (Doc. 43 at 18). Steak and Ale responds that under its sexual harassment policy Deel was obligated to report Valdes' conduct and knew of this obligation and the means by which to fulfill it but unreasonably failed to do so.

The court concludes that Steak and Ale has demonstrated that Deel unreasonably failed to take advantage of corrective opportunities provided in the company's sexual harassment policy. As discussed previously, even if the toll-free hotline was not operational when Deel called in mid-December 2003, she unreasonably failed to avail herself of other clearly available reporting options. Had Deel acted in accordance with the sexual harassment policy and reported the conduct when it commenced in early November 2003, giving the company the opportunity to step in and put a stop to it as it attempted to do immediately when notified two months later, much of the complained-of harassment by

Valdes could have been averted.

For all of the foregoing reasons, the court finds that Steak and Ale has satisfied its burden of establishing by a preponderance of the evidence that it exercised reasonable care to prevent and correct promptly Valdes' sexually harassing behavior. Additionally, the court finds that Steak and Ale has likewise met its burden of showing by a preponderance of the evidence that Deel unreasonably failed to take advantage of any preventive or corrective opportunities provided by the company. In short, Steak and Ale has established its entitlement to the Ellerth-Faragher affirmative defense and cannot be held liable for the sexual harassment by Valdes alleged by Deel.[16] Summary judgment shall therefore be granted in Steak and Ale's favor as to Count One of Deel's amended complaint.

Count Two: Retaliation

In addition to prohibiting employers from discriminating on the basis of sex, Title VII makes it unlawful "for an employer to discriminate against any of his employees or applicants for employment . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a). In order to establish a prima facie case of retaliation, the plaintiff must show: (1) she engaged in protected activity; (2) she suffered

---

[16] In a footnote Deel also asserts that in addition to being held vicariously liable Steak and Ale should also be held directly liable for Valdes' conduct. (Doc. 43 at 10, n. 6). This argument, which Deel has given little attention, likewise merits little attention by the court.

Direct liability arises when the employer either knew or should have known of supervisory harassment but failed to take remedial action. Dees v. Johnson Controls World Services, Inc., 168 F.3d 417, 421-22 (11th Cir. 1999). Deel has failed to point to any evidence that Steak and Ale had actual knowledge of the harassment until she complained to Edwards on January 1, 2004. Nor has Deel come forward with evidence which suggests that Steak and Ale had constructive knowledge of Valdes' misconduct. Constructive knowledge arises when sexual harassment so permeates a workplace as to give the employer notice of the misconduct. Allen, 121 F.3d at 647. In the instant case, although the court has concluded that a genuine issue of fact exists as to whether sexual harassment was pervasive at the Pensacola Steak and Ale, the evidence of the egregiousness of the alleged inappropriate conduct falls far short of that described in Allen, 121 F.3d at 645 (describing evidence produced by plaintiff, including that employees as well as supervisors engaged in sexual intercourse at the plant, frequently told sexually explicit jokes throughout the facility, used vulgar and sexually demeaning language, and that employees groped the breasts and genitals of other and also exhibited their genitals and buttocks). While Valdes allegedly made numerous inappropriate comments to Deel and others, this conduct alone cannot serve as a basis for imputing constructive knowledge to Steak and Ale of supervisory harassment as to which it failed to take action, at least until January 2004.

an adverse employment action; and (3) there was a causal link between her protected activity and the adverse employment action. See Stavropoulos v. Firestone, 361 F.3d 610, 616 (11th Cir. 2004) (citation omitted); Gupta, 212 F.3d at 587. Once a plaintiff has established a prima facie of case of retaliation the employer then has an opportunity to articulate a legitimate, non-retaliatory reason for the challenged employment action. See Pennington v. City of Huntsville, 261 F.3d 1262, 1266 (11th Cir. 2001). If that burden is met, the plaintiff then bears the ultimate burden of proving that the reason provided by the employer is a pretext for retaliatory conduct. Id.; Meeks v. Computer Associates International, 15 F.3d 1013, 1021 (11th Cir.1994); Pennington v. City of Huntsville, 261 F.3d 1262, 1266 (11th Cir.2001). A plaintiff may establish pretext "by either proving that intentional discrimination motivated the employer or producing sufficient evidence to allow a rational trier of fact to disbelieve the legitimate reason proffered by the employer, which permits, but does not compel, the trier of fact to find illegal discrimination." Wilson v. B/E Aerospace, Inc., 376 F.3d 1079, 1088 (11th Cir. 2004).

In the instant case, Steak and Ale does not argue that Deel has failed to establish a prima facie case of retaliation, and the court concludes, without the need for extended discussion, that she has satisfied all three elements. There is no question that Deel engaged in protected activity by lodging a complaint against Valdes and that she suffered an adverse employment action by being fired. Deel has also satisfactorily established the requisite causal link between the two events. Edwards and DeVries, to whom Deel complained about Valdes' sexual harassment, obviously were aware of Deel's protected activity at the time of the adverse employment action in which DeVries, with Edwards present, fired Deel. Thus Deel has shown that Steak and Ale was aware of the protected activity at the time she was discharged, which knowledge under the facts of this case is sufficient to make out the causal connection. See Raney v. Vinson Guard Services, Inc., 120 F.3d 1192, 1197 (11th Cir. 1997). Moreover, the record supports that the protected expression and the adverse employment action were not "wholly unrelated." Hairston v. Gainesville Sun Publishing Co., 9 F.3d 913, 920 (11th Cir. 1993). The court therefore proceeds to consideration of whether Steak and Ale has come forward with a legitimate,

non-retaliatory reason for terminating Deel's employment and, if so, whether Deel has met her burden with respect to showing that the reason is mere pretext.

Steak and Ale submits that Deel was fired for conversing with Fischler about Fischler's sexual relationship with Jamal because it concluded that Deel had violated and failed to enforce its anti-harassment policy after receiving training and instructions just six weeks prior. According to Steak and Ale, even if its decision to fire Deel was based on some erroneous facts regarding the Fischler incident, it has articulated a legitimate, non-retaliatory reason for its employment action. In response, Deel does not argue against a finding that Steak and Ale has met its burden of production, and the court concludes that the company has.

The court next considers whether Deel has produced evidence sufficient to allow a reasonable jury to disbelieve Steak and Ale's proffered reason and permit it to conclude that Deel's firing was retaliatory. Wilson, 376 F.3d at 1088. Upon careful review of the record, the court concludes that Deel has met her burden. As an initial matter, the court does not find Steak and Ale's stated reason for dismissing Deel to be wholly implausible. Indeed, the Appeals Referee determined that Deel was fired for misconduct. The undisputed evidence, however, is that Valdes engaged in egregiously improper conduct over the course of two months, for which he was punished by being demoted to a lower position at the same base salary and transferred, at company expense, to another restaurant. The evidence also reflects that Deel's conduct, at the very least, involved just one occasion in which she failed to put a stop to Fischler's inappropriate discourse or, at most, actively engaged in and encouraged the improper conversation with Fischler. For this conduct Deel was fired. Thus, in contrast to the treatment Valdes received for flagrant violation of the company's sexual harassment policy, Deel was punished with the ultimate employment sanction for engaging in arguably far less serious conduct. It is true that Deel had been refreshed in sexual harassment training only six weeks prior to her discharge, but it is also true that both Valdes and Deel had received anti-harassment training in the past and were similarly obligated to comply with and enforce the company's sexual harassment policy. Furthermore, Lord and Vandal also received additional sexual

harassment training along with Deel but, unlike Deel, were merely reprimanded for failing to stop the conversation or report it; Fischler also was merely reprimanded for engaging in the conversation.[17] Finally, Lord not only received minimal punishment for her involvement in the incident but also was in fact promoted to the position of general manager following it.

As it must, the court views the evidence in the light most favorable to Deel. So doing, the court is persuaded that a reasonable jury could conclude that Steak and Ale's reason for discharging Deel was pretextual and that its actual motive was retaliation for Deel's making allegations against Valdes which forced his removal from the restaurant when she would not accede to his remaining there. Summary judgment as to Count Two of the amended complaint shall therefore be denied.

Accordingly, it is ORDERED:

Defendant MRSMC's motion for summary judgment (doc. 30) is GRANTED in part and DENIED in part, as follows:

1. The motion is GRANTED as to Count One. Count One is DISMISSED with prejudice.

2. The motion is DENIED as to Count Two.

DONE and ORDERED this 3rd day of April, 2006.

s/ *M. Casey Rodgers*

**M. CASEY RODGERS**
**UNITED STATES DISTRICT JUDGE**

---

[17] Steak and Ale argues that Valdes, Lord, Vandal, and Fischler are not proper comparators for purposes of demonstrating pretext because, for various reasons, they were not similarly situated to Deel. To show that employees are similarly situated, a plaintiff must establish that the employees are "similarly situated in all relevant respects." Wilson, 376 F.3d at 1091. The comparator must be "nearly identical" to the plaintiff to prevent courts from second-guessing a reasonable decision by the employer. Id.

In this case, the court concludes that Deel has presented evidence sufficient to create a genuine issue of fact as to whether Valdes, Lord, Vandal, and Fischler were similarly situated to her. Steak and Ale will be free to argue any factual distinctions between Deel and Valdes, Lord, Vandal, and Fischer to the jury in support of its contention that Deel has failed to establish pretext.